IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No.: 5:21-cv-00215

| | | |
|---|---|---|
| SEONAID RIJO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **(Jury Trial Demanded)** |
| N.C. JUSTICE CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## NATURE OF THE ACTION

1.      This is an action by Plaintiff Seonaid Rijo ("Plaintiff" or "Rijo") under Title I of the Americans with Disabilities Act (ADA) of 1990, as amended, (42 U.S.C. § 12101 et seq.) and under the North Carolina Persons with Disabilities Protection Act (N.C. G.S. § 168A-1 et seq.) to redress disability discrimination and retaliation and sex discrimination and retaliation and correct unlawful employment practices by Defendant NC Justice Center ("Defendant" or "NCJC") against Rijo because of her disability and her resistance to unlawful discrimination.

2.      All references to the ADA in this Complaint shall be understood to also refer to all State law claims arising under Chapter 168A of the North Carolina General Statutes.

3.      This is an action under Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000e et seq.) to redress illegal sex and race discrimination

- 1 -

against Plaintiff.

4.     This is also an action under the Family and Medical Leave Act (FMLA), 29 U.S.C.A. §§ 2601 et seq., to redress willful acts of interference with FMLA rights, and also to redress willful acts of discrimination and retaliation by Defendant based on Plaintiff's need for, and receipt of, FMLA.

5.     This is also an action alleging *inter alia* that Defendant willfully misclassified Plaintiff as an exempt employee and failed to pay her overtime compensation and possibly minimum wage entitling her to recover the same as well as liquidated damages in violation of the Fair Labor Standards Act 29 U.S.C. § 201 et seq.

6.     This is also an action under State law against the Defendant on behalf of the Plaintiff for wrongfully discharging Plaintiff in violation of public policy as a result of her resistance and opposition to Defendant's actions including the above violations of law, but also  her resistance and opposition to creating and recreating billing entries for Defendant's attorneys for submission to the Court as part of a fee petition,  for complaining about improper and possibly illegal practices by the Defendant with regard to *inter alia* trust account management, wage and hour practices, timely remittance of escheat funds to the N.C. Department of State Treasurer, and other improper and unethical actions.

## PARTIES, JURISDICTION AND VENUE

7.     Plaintiff Rijo was employed by Defendant at the time of the acts alleged in this Complaint and lives in Wake County, North Carolina.

8.     Defendant has been and is now an North Carolina nonprofit corporation

- 2 -

with its primary place of business in Wake County, North Carolina, and at all relevant times Defendant has been an employer under 29 U.S.C.A. § 2611(4), 42 U.S.C. §§ 12111(2), 12111(5), and N.C. G. S. § 168A-3.

9.     This Court has jurisdiction over Plaintiff's ADA, FMLA, and FLSA claims under 28 U.S.C. §§ 1331 (federal question) and over Plaintiff's state law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

10.     The acts which are the subject of this action and alleged to be unlawful were committed in the Eastern District of North Carolina.

11.     Plaintiff was issued a right to sue letter dated February 7, 2021, and this Complaint alleging that the Defendant violated Plaintiff's rights to be free from discrimination and retaliation under the ADA is filed within less than 90 days from that date.

## STATEMENT OF FACTS

12.     Plaintiff was hired on June 28, 2010, and worked as a paralegal for Defendant for more than eight years, prior to her termination on August 8, 2018.

13.     During this time, the fact that she had a need for a flexible work schedule due to her medical condition of fibromyalgia which was well known to management and her supervisor.

14.     Defendant accommodated Plaintiff's fibromyalgia with a flexible work schedule until February 23, 2018, because it was reasonable to do so and because Plaintiff was qualified and able, as a result of the reasonable accommodation, to perform all of her essential job functions at a very high level as evidenced by many years of

- 3 -

excellent evaluations.

15.     Plaintiff reported to Carlene McNulty when she was hired in 2010. At that time, Ms. McNulty was a staff attorney and part of the hiring team that hired Plaintiff. Plaintiff had private sector, high level paralegal experience for large firms in large cities prior to working with the Defendant; this experience made her a very attractive candidate to Ms. McNulty.

16.     When she started working for Defendant, she was shocked by the contrast between the processes and procedures in place at the NCJC and her past employers. She found that the Defendant's litigation department was completely disorganized and lacking many basic systems for handling litigation in a professional manner and in compliance with State bar procedures.

17.     However, the condition of the department allowed Plaintiff to make significant contributions in the form of newly established organizational and litigation case file management procedures that Plaintiff was able to convince Ms. McNulty and the then Executive Director Melinda Lawrence were needed.  Plaintiff subsequently helped implement these much needed procedures.

18.     Sometime after Plaintiff's hire, a third-party outside salary consulting firm hired by Defendant made recommendations to Defendant about employee classifications and salaries.  The consultants had been hired to study each employees' qualifications, job duties, responsibilities, and performance level  in order to ensure that the staff were appropriately paid and classified.  Within 11 months of her hiring, Plaintiff was promoted to "Senior" Litigation Paralegal.

-  4  -

19.    As a result of the salary study, Plaintiff was also given a prospective salary increase of approximately $12,000 annually, which was an approximately 21-22% increase in salary) again after only 11 months of working at the NCJC.

20.    As a result of the study, Ms. McNulty was also promoted to the position of Senior staff attorney.

21.    From hire, Plaintiff's job duties with the NCJC exceeded those duties listed on her job description.  Immediately upon being hired, the Justice Center heavily relied on her extensive knowledge of court rules of civil procedure.  Plaintiff made numerous contributions to the Justice Center during her tenure there, such as:

- creating a uniform docket system for all litigants;

- single-handedly creating implementing a uniform manner of organizing case files;

- tracking attorneys' dockets for each county in which they had cases and establishing a procedure for reviewing them daily for court proceedings or hearings scheduled;

- implementing a filing system both in paper form and electronically in a manner that adhered to recommended standards with regard to file openings, maintenance, and destruction;

- assisting attorneys with implementing organizational process with regard to discovery, e.g. bates-stamping;

- drafting templates to be used with notices of hearing, subpoenas, depositions, and form letters to the courts and judges.

- 5 -

22.    Even though she was not assigned to the Defendant's immigration practice, because she was fluent in Spanish, Plaintiff also helped implement policies and procedures for that department such as drafting letters to immigration clients whose files were being closed and funds being reconciled.  She also corrected form letters written in Spanish for cases involving Spanish speakers, when she found the letters being used were fraught with grammatical and linguistic errors.

23.    During her tenure with Defendant, Plaintiff was routinely assigned high profile and very important work on litigation directly related to the Defendant's mission. Because of her skill set which was comparable to an beginning attorney's skill set, Plaintiff was often assigned to provide certain types of training to the immigration and worker's rights attorneys whenever they had a complex litigation case.

24.    During her tenure with Defendant, Plaintiff went to extraordinary lengths to make her supervisor, Ms. McNulty, look good by assisting her with superior work-product and by creating and implementing uniform and compliant policies and protocols in the litigation department.  Plaintiff believed that her support of Ms. McNulty resulted in a re-evaluation of Ms. McNulty's abilities, given that Ms. McNulty had worked since the inception of the Justice Center in the 90s, and never been promoted until Plaintiff became her assistant.  Plaintiff had served in the role of Ms. McNulty's chief paralegal for more than two years, and after  about three years of employment with Defendant, Executive Director Melinda Lawrence restructured Defendant's organization and Ms. McNulty was consequently promoted to Litigation Director.

25.    Ms. McNulty allowed the Plaintiff significant autonomy and flexibility. The

- 6 -

workplace flexibility enjoyed by Plaintiff was not altogether significantly different from the flexibility in work hours widely enjoyed by nearly all of Defendant's employees.

26.    In fact, prior to February 2018, Plaintiff never had a set time schedule. This was in fact the same for the vast majority of employees at the NCJC who also did not have set work hours at the NCJC.  To the extent that Plaintiff enjoyed additional flexibility not enjoyed by other paralegals and support staff, she understood it to be a reasonable accommodation for her fibromyalgia and for her working numerous hours of unpaid overtime on nights and weekends.

27.    Plaintiff used the flexibility in her work schedule for days when her illness had unforeseen flareups or when she needed time for her medications to work. Defendant allowed Plaintiff to come in later in the work day and from home on a regular basis.  Plaintiff still worked full work days and overtime on many occasions.  On the infrequent occasions she was not able to work full days, the remaining hour or so would be jotted by Plaintiff as paid time off (PTO) because the NCJC allowed employees to use their PTO hours as they wished without giving reason, and then subsequently to make up hours.

28.    Although the 2008 Policy Manual at the NCJC listed 9:00 a.m. to 5:00 p.m. as the Center's official business hours, the vast majority of employees never adhered to that time frame and instead tracked their work times on a good-faith basis.  Ms. McNulty instructed Plaintiff to keep her actual hours off the record because no one tracked billable hours.

29.    For most of Plaintiff's years working for Defendant, the employees used

- 7 -

paper time sheets. Ms. McNulty routinely signed Plaintiff's timesheets, which stated that Plaintiff worked 8 hour days. Ms. McNulty was aware however that Plaintiff routinely worked more than 8 hours in a day and did not take lunch breaks. Ms. McNulty explained to Plaintiff that this practice kept them both from having problems with Defendant's management and losing their jobs, since Ms. McNulty implied that their jobs were precarious and that only she could secure job security for Plaintiff. Ms. McNulty regularly assured Plaintiff that she would see that Plaintiff always had a job so long as Ms. McNulty was working for Defendant.

30.     The work schedule flexibility and informal time-keeping were due to two main reasons: first, the Defendant had no adequate manner of tracking when employees arrived or left the office until approximately 2015 or so, when Defendant implemented key fobs for security reasons.

31.     Even after the implementation of key fobs, if employees came through the front reception area or behind employees who scanned their fobs, there was no way of HR or the Center accurately knowing what times employees arrived and left each day or how long they took lunch breaks or additional morning or afternoon breaks to get refreshments and socialize with colleagues.

32.     The second reason for the universal workplace schedule flexibility and informal time-keeping for Defendant's employees was because Defendant touted itself as a progressive, family-friendly work environment that valued employees' feelings of happiness and good-faith independent work that often could not be measured. In fact, Defendant's policies espoused a family-friendly environment along with a very generous

- 8 -

6-weeks paid time off for employees to take as they wished without having to give any particular reason. Defendant's employees understood that they were offered this significant autonomy and flexibility as a trade-off for the lack of higher salaries, annual bonuses, and other professional development opportunities, and Ms. McNulty confirmed this on many occasions.

33.     As far as Plaintiff understood and observed, the timekeeping system used by Defendant was simply in place as a formality because no employees actually recorded the actual hours that they worked. NCJC employees routinely recorded eight hour days when they worked far more or less. In fact, from the commencement of Plaintiff's employment she had averaged ten or more hours of overtime a week which Ms. McNulty acknowledged regularly and definitely during each annual evaluation.

34.     Sometime in 2012, Plaintiff was told, and upon that information, believes that  one of Plaintiff's paralegal co-workers and another senior paralegal employee in the immigration department, who eventually left to take positions elsewhere, were paid $10,000 by Defendant to resolve potential overtime claims because they had been allowed to work overtime off the books, so to speak. When Plaintiff asked about this, she was told that they were paid overtime because they had been erroneously classified as exempt when they should have been paid overtime as non-exempt. Plaintiff did not understand why she was not getting overtime because she was also a paralegal.

35.     At some point, after Ms. McNulty informed Plaintiff that Rick Glazier, hired as Executive Director in 2015, had sent out the survey asking attorneys to provide information about the work being done by their subordinate employees because he had

begun to realize that the workload of various attorneys and paralegals was disproportionate and that Plaintiff who was serving as Ms. McNulty's senior paralegal in the biggest class action case was being required on a routine basis to work late nights and weekends.

36.    Ms. McNulty explained that if she filled out the survey, Mr. Glazier would accuse her of not managing the attorneys and paralegals under her supervision well enough to level the workload of Plaintiff and other attorneys who were performing a disproportionate amount of work.

37.    On one occasion, in front of Ms. McNulty, in Mr. Glazier's office, Mr. Glazier stated that it was clear that Plaintiff needed a clerical assistant because of the many hours he saw her work and did not want Plaintiff overutilized any further as he had noticed Plaintiff's late hours, weekends, and especially standing many times two or more hours at a copy machine.

38.    In response, Ms. McNulty stated that she was going to restructure the paralegals to take on the all clerical aspects of Plaintiff's work, because Plaintiff worked for the Ms. McNulty (Litigation Director) and the four attorneys with the heaviest caseload, and in addition was required to assist other attorneys to whom Plaintiff was not primarily assigned.

39.    Ms. McNulty regularly represented to Plaintiff that she was working on getting Plaintiff an administrative assistant and payment for her hours of overtime because of the high level of responsibility placed on her by Defendant.  Not only did Plaintiff had a full-time job as a senior paralegal for three litigation attorneys, which

- 10 -

included Ms. McNulty, the Litigation Director, but Plaintiff was also constantly pulled in to work on all complex matters for other attorneys and other management employees of the NCJC, such as the CFO. Because of the workload assigned to Plaintiff, there would be no way Plaintiff could have performed it all in the standard workday with a one hour of lunch, and Defendants knew this.

40.     During most of her time working for Defendant and Ms. McNulty, Plaintiff considered Ms. McNulty to be a close personal friend in addition to her supervisor. Plaintiff was extremely loyal to Ms. McNulty and was always working to ensure that Ms. McNulty looked good professionally.

41.     Defendant's policies called for annual evaluations. At each annual evaluation, Ms. McNulty remarked upon Plaintiff's tremendous work ethic in spite of her disability and acknowledged that Plaintiff routinely worked in excess of forty hours on a weekly basis. Ms. McNulty would also ask Plaintiff how Ms. McNulty could make her feel happy working for Defendant and seek assurances from Plaintiff that she would not seek other employment. Ms. McNulty made it clear to Plaintiff that she recognized the Plaintiff was at risk of "burning out" from the many hours of work and continued added responsibilities.

42.     At the evaluations, Ms. McNulty would promise that she was working on getting Plaintiff paid the overtime she was owed, and a salary increase. In addition, because of the high level of work performed by Plaintiff, recognized by Defendant's calling her a "Senior Paralegal," Plaintiff was also promised that the litigation department would obtain clerical assistance so that Plaintiff would not have to work

- 11 -

late and on weekends to keep up with the filings and other clerical matters that she was also required to do in addition to her working hours during which she performed her senior paralegal functions.

43. Ms. McNulty's evaluations consistently gave Plaintiff excellent remarks, stated that Plaintiff was a valuable employee who made extensive contributions to the Defendant, that she made the organization look good, and that she had made significant contributions in many areas to the litigation department process and procedures and organization.

### NONCOMPLIANCE ISSUES:
### LACK OF TRUST FUND ACCOUNTING PROCEDURES AND
### FAILURE TO ESCHEAT UNCLAIMED TRUST FUNDS

44. At some point after her arrival at the NCJC, Plaintiff found that under the then chief financial officer's (CFO) leadership, or lack thereof, the finance department's handling of client trust accounts and unclaimed funds were in violation of the NC Bar Association's rules of client trust fund accounting and the rules and procedures of the N.C. Department of State Treasurer governing the escheating of unclaimed trust funds.

45. The CFO at the time Plaintiff was hired was Mary Coleman (African American Female), who had worked for many years at the NCJC. It was common knowledge to the staff that during CFO Coleman's tenure, that the NCJC had been required to hire an outside, objective mediator to mediate employment issues between Ms. Coleman and her then assistant Elise Elliott (White/Caucasian Female).

46. Defendant's non-compliance with the regulations of escheating unclaimed client trust funds was either due to a lack of awareness or purposeful disregard of the

- 12 -

regulations. Whichever reason, over twenty years of unclaimed client trust funds should have, but had not, been escheated to the State Treasurer. Either the funds had not been discovered by, or had been hidden from, the Defendant's auditors.

47. Plaintiff also learned that Defendant had operated for decades without uniform standards of managing and retaining client trust account records. Plaintiff notified Ms. McNulty of these non-compliance issues.

48. At some point Ms. Coleman's relationship with Ms. Lawrence, the then Executive Director, deteriorated and matters came to a head when one day CFO Coleman had a visible and audible shouting match with Lawrence, and subsequently left the NCJC. Upon information and belief, a lawsuit between CFO Coleman and Defendant was settled which may have involved potential allegations of discrimination. It took some time to find a replacement for Ms. Coleman and during this time, no one was serving as CFO.

49. Coleman was eventually replaced by Susan Dunn, the new CFO. After CFO Dunn's arrival, Plaintiff expected that Dunn would deal with the trust fund accounting and escheats issues. Instead, Plaintiff was assigned to deal with the issues. With no assistance from any of the NCJC lawyers, Plaintiff researched the escheats rules and procedures and the required State Bar procedures required to properly maintain and account for the funds in trust. Plaintiff even had to research Florida law because some of the escheating funds had to be escheated in Florida under that State's rules for escheating unclaimed property.

50. The source of the unclaimed funds was money belonging to former NCJC

clients. The funds had not been placed in a client trust account as required by the State Bar. These funds even included, as one example, a 15+ year old money order that was filed away in a manilla file folder in an immigration file.

51. Plaintiff set up the trust account for the clients whose funds were being held by Defendant. Plaintiff also created a docket which contained information about the funds so that the funds could be escheated in compliance with State regulations after the requisite dormancy period.

52. These funds were being held because no one had maintained contact information on the clients and they were purportedly unable to be tracked by either the attorneys working on their cases or by the CFO. Plaintiff located addresses for many of the individuals and drafted letters making the required attempts to first find the former client who were owners of client trust funds.

53. Plaintiff eventually completed all escheats on all funds which met the required dormancy period in both NC and Florida and for whom she could not find an owner.

54. Finally, Plaintiff wrote a memo to CFO Susan Dunn with a copy to Ms. McNulty, then serving as Litigation Director, outlining step-by-step rules and procedures for trust fund accounting and escheats compliance going forward. Plaintiff believed after providing a written memo with detailed instructions that the escheating of unclaimed client trust funds would then be the responsibility of the CFO Dunn. Instead, Plaintiff remained the sole responsible person at the NCJC because no one wanted to be responsible for the remaining lack of compliance with trust fund

accounting and escheats rules and procedures and for the fact that the unclaimed funds were hidden from the annual auditors.

55.     The remaining noncompliance issues were known to Defendants. For example, one of Ms. McNulty's clients was deceased but had unclaimed funds with Defendant.  Even though Ms. McNulty knew the deceased client had a son and would be entitled to access the funds if escheated, Ms. McNulty stated she did not like the son and instructed Plaintiff to just keep docketing the funds in the trust account year after year rather than escheating them.

56.     Ms. McNulty also hid trust account matters especially in immigration cases from auditors by creating a spreadsheet in various cases where she would make up numbers to total zero money owed or show nominal money owed.  She would also ask the immigration paralegals to call the former clients whose money was being held by Defendant and ask them to donate their funds which were nominal owed back to the NCJC so other immigrants could be helped.

57.     Likewise, in some immigration cases where NCJC attorneys did not act with due diligence to give money won in cases to immigrant workers, when they finally got around to doing so, they had no accurate records of the clients' addresses.   Plaintiff was aware of at least two immigrant clients' (seasonal workers) $3,500 settlement checks that were escheated nearly six years after the clients should have gotten the money.

58.     With regard to another NCJC client, the funds held could not be escheated because Ms. McNulty could not determine the appropriate amount of money to be

escheated. At times, it was reported in Defendant's records that there was a zero balance with no supporting evidence, when a zero balance was obviously not correct. When Plaintiff inquired what to do, Plaintiff was told each year to just keep docketing the client until the CFO Dunn and Ms. McNulty could figure out the exact amount of the client's funds held in trust.

## QUESTIONABLE HIRING AND EMPLOYMENT PRACTICES

59. At some time after Ms. Coleman's shouting match with Ms. Lawrence and her resignation, HR Director (Helena O'Connor) also resigned from her position because of repeated conflicts between herself and Ms. Lawrence.

60. Ms. Lawrence then unilaterally promoted the Lucy Martinez, who was then serving in the position of administrative assistant to Ms. O'Connor, and who was performing mostly clerical duties to replace Ms. O'Connor without following NCJC's usual hiring practice and policies. Those policies and practices involved posting the position for internal applicants. If no internal applicant with the appropriate qualifications and work experience applied for the position, then Defendant's policy required positions to be advertised to the general public.

61. Ms. Martinez was widely considered by the staff to lack the adequate qualifications, background, and experience to handle employment matters. Nor was she considered to be an objective mediator to handle conflicts between employees and supervisors. Her promotion to this position created a lot of tension in the office. Employees believed that Ms. Martinez was promoted beyond of her capabilities by Ms. Lawrence because it was easier for Ms. Lawrence not to deal with HR personnel that

- 16 -

might challenge her.

62.    In fact, many times after Ms. Martinez' promotion when Plaintiff would approach her about employment matters, Ms. Martinez' routine response would be "what Melinda wants, Melinda gets." During those years, Plaintiff had been nominated by her peers (as was the protocol at the NCJC) to be a member for a two-year tenure of what the NCJC called the "A-Team." The role of the A-Team was to periodically (once each month) meet with HR and the Executive Director to bring matters of staff grievances or concerns. One of the constant grievances from the staff was that the staff felt the NCJC did not have an adequate and impartial Human Resource director in Ms. Martinez, and no one knew what the expectations of Ms. Martinez' new role and functions were. The A-Team requested a job description for Ms. Martinez' role as Human Resource Director to no avail.

63.    Upon information and belief, sometime after CFO Dunn was hired in 2014-2015 to finally replace former CFO Coleman, Ms. Lawrence resigned from her position as Executive Director on information and belief due to multiple internal conflicts that involved her autocratic and tyrannical management style and a common perception among staff that she favored males over females in advanced positions.

64.    After Ms. Lawrence resigned, Rick Glazier was eventually hired to serve as Executive Director in 2015.  Ms. Martinez' role remained uncertain even when Mr. Glazier joined the NCJC.  However, after he was hired, he promoted all management members to new titles that included the term "deputy."  Thus, Ms. Martinez' new title became "Deputy Director of Human Resources" and the  CFO Dunn was given a new

- 17 -

title "Deputy Director of Operations and Chief Financial Officer." Ms. Martinez then became an integral part of the executive management team without any prior experience in handling matters of mediating any concerns or grievances between staff and supervisors.

65. Because of her close relationship with Ms. McNulty, Plaintiff was privy to other information about management. For example, Ms. McNulty told Plaintiff that Ms. McNulty had purposefully not attended an evaluation set for her by Mr. Glazier in the Fall of 2017.

66. Ms. McNulty repeatedly stated to Plaintiff that Rick Glazier, the Executive Director, was out to fire Ms. McNulty because Ms. McNulty was the only one in management courageous enough to stand up to him for hiring his daughter as his personal assistant and for opposing other questionable hiring practices.

67. Ms. McNulty also told Plaintiff that she had complained to HR Martinez that she was not courageous enough to supervisor Mr. Glazier's daughter, even though his daughter fell under HR's supervision. In fact, HR never knew his daughter's comings and goings or tracked her time or work or gave her evaluations.

68. Ms. McNulty also confided to Plaintiff that she and Plaintiff were both not liked by CFO Dunn or HR Martinez, who Ms. McNulty implied were scrutinizing Plaintiff and Ms. McNulty, their work, and their salaries, with the implication being that Plaintiff and Ms. McNulty could potentially lose their jobs.

69. Ms. McNulty and other staff remarked from time to time on the common observation that Mr. Glazier had not diversified Defendant's management with any

- 18 -

African American or Latino employees.

70.    When Mr. Glazier hired two staff  members soon after NCJC had laid off two employees, staff were becoming fearful and worried about the financial ability of the NCJC to pay for so many salaries.

71.    Ms. McNulty also confided to Plaintiff that she believed Mr. Glazier had turned down qualified African-American applicants.  She also informed Plaintiff that the   African-American employee hired to assist the Endowment Director Kim-Marie (White/Caucasian/Female) was fired due to tensions between her and the Endowment Director, and rather than hire another African-American assistant, Mr. Glazier hired a white/Caucasian/female assistant because he said it would be easier for two white women to work together.

72.    Furthermore, Ms. McNulty informed Plaintiff that Nicole Dozier (African American), a paralegal/director working with the HAC and who was serving  as the most senior member of the NCJC's EEO committee, had forced HR Director Martinez in a meeting with Ms. McNulty to declare herself bi-racial despite Ms. Martinez' personal feelings that she did not have to do so if she did not personally choose to identify as bi-racial.

73.    The matter arose in the meeting when someone remarked at a meeting that only one staff member (Plaintiff) was bi-racial.  Dozier then turned to Ms. Martinez and challenged her to identify as bi-racial so that the NCJC could say they had two bi-racial employees.  Ms. McNulty stated that Ms. Martinez said she identified her racial composition depending on the crowd she was with, and apparently that response

angered Ms. Dozier.

74.    Ms. McNulty and Plaintiff discussed the fact that that the Endowment Director Kim-Marie had complained on numerous occasions that she would never benefit from the NCJC's maternity and paternity policy. In addition, Ms. McNulty indicated to Plaintiff that Mr. Glazier was angry that two married employees, Mr. Al Ripley and Mrs. Ripley-Frasier, had both enjoyed the benefits of both maternity and then paternity leaves for the birth of their two children while employed with Defendant.

75.    Ms. McNulty also informed Plaintiff that other members of Defendant's management team, including human resources (HR) and the chief financial officer (CFO), did not understand Plaintiff's type of work or her extensive knowledge and skillsets which were comparable to a lawyer's in many respects. As a result, they did not understand why Plaintiff's salary was commensurate with that of the staff attorneys.

76.    In fact, during many of the years they worked together, Ms. McNulty and Plaintiff were frequently allied against members of Defendant's management team due to common concerns about various unsavory business practices by Defendant. However, in the late fall of 2017, when tensions began between Ms. McNulty and Plaintiff, Ms. McNulty stopped allying herself with Plaintiff and allied herself with other management team members.

77.    As one example, at a management team meeting HR director Ms. Martinez stated that one of Defendant's employees was costing their health care plan $130,000 in non-generic medication and that expense had resulted in a premium increase for all

- 20 -

staff.

78.    Ms. McNulty approached Plaintiff after the meeting and asked her if she was taking non-generic medication.  Plaintiff assured Ms. McNulty that her medication for her condition of fibromyalgia, which condition was common knowledge among Defendant's employees, was generic. She asked Plaintiff to produce the medication so she could read the label.

79.    After this, and because her condition was well-known, Plaintiff then began to believe that other employees suspected they had to pay more for benefits because of Plaintiff's condition and that they resented her for the same.  Plaintiff assured Ms. McNulty and other employees that asked about her medications that all her medications were generic.

**LATE 2017**

80.    In the fall of 2017, the relationship between Plaintiff and Ms. McNulty began to be strained after a very large case settled in mediation hereinafter the Austin case.

81.    The Austin case was actually not initiated by attorneys working for Defendant, but by a private attorney.  Defendant's attorneys became involved in 2012 and eventually Ms. McNulty became the lead attorney on the case.

82.    After Defendant became involved in the case, Plaintiff single-handedly identified over 77,000 individual potential plaintiffs for the lawsuit as a result of her research in all 100 counties in North Carolina looking for related cases for the time period of October 2009 through October 2016.

- 21 -

83.    The duties Plaintiff performed on this case between 2012 and when the case settled were again consistent with her other high-level senior paralegal functions, and included performing independent court research, researching information on the case fact finding, skip tracing, finding pleadings of attorneys whose motions had prevailed in court and providing those to Defendant's attorneys working on the case. The work performed by Plaintiff was used by Defendant's attorneys to communicate with other attorneys who had successfully implemented legal strategies in cases with similar issues.

84.    Plaintiff also spent time drafting court documents, motions, notices of depositions, in and out-of-state depositions, coordinating logistics of depositions with national court reporters within and outside of North Carolina, drafting correspondence to judges, judicial assistances, sheriff's offices, opposing counsel, and clients, filing court documents and ensuring service of the same to all parties in accordance with civil rules of procedure, among many other functions and work Plaintiff independently performed on the case.

85.    Based on Plaintiff's work, Ms. McNulty and her co-counsels were able to get obtain a victory in one case that established a precedent in the other counties and created sufficient leverage to enable them to negotiate a multi-million dollar settlement of the class action in the fall of 2017.

86.    The Austin case represented  the Defendant NCJC's biggest class action settlement case in all its years of operation since the 1990s.

87.    Unfortunately, when Defendant realized it would have to document its

fees, costs, and expenses to get court approval because the case was a class action, management realized two problems. The first issue was that the NCJC staff working on the case did not have established billable rates. The second issue was that neither Ms. McNulty or any of the other NCJC attorneys had tracked a single minute of their time in the case and had to recreate 6-7 years of work.

88. To resolve the first issue, Ms. McNulty conducted research to determine an appropriate amount to charge for attorney and paralegal times. Ms. McNulty decided that Plaintiff's hourly rate should be based on the rate her former employer, a private law firm, had charged for her time in 2007. Plaintiff's billable rate at that time was between $155 and $165 per hour; thus, Ms. McNulty decided to charge less than that per hour for Plaintiff's time.

89. As for the second issue of accounting for time spent on the litigation, Plaintiff had begun working on her own time once Plaintiff was informed by Ms. McNulty that for the first time in all of her years of working at the NCJC, Ms. McNulty wanted to submit the time Plaintiff worked on the case as a senior paralegal for payment by Defendants.

90. While Plaintiff was not required to keep time of her hours working on cases for Defendant for billable purposes, because Plaintiff had worked many years in private firms in large cities, and because her work was so involved on the case, Plaintiff's time on the case was easily quantifiable and accounted for by the computer records of her time spent at court and the days she was returning from court and loading the documents onto the NCJC computer, and also because Plaintiff kept an independent

- 23 -

chart of her work performed on her personal computer out of habit. Plaintiff began the process of documenting her time working on the Austin case.

91. Ms. McNulty and the other NCJC attorneys began attempting to create time records by looking at Plaintiff's work and her records of court research. After reviewing Plaintiff's time, Ms. McNulty would then try to estimate a reasonable time that would look proper in her fee petition.

92. As they became overwhelmed with the enormity of the task, Ms. McNulty instructed Plaintiff to also recreate Ms. McNulty's attorney's time. Under pressure and tensions with her co-counsel, Ms. McNulty informed Plaintiff that she expected Plaintiff to review all six attorneys' time records and expenses to reconcile them, and ensure they all matched up and were consistent, so that none of the entries would cause a problem since the documents being submitted for the fee petitions would be public record. Eventually, Plaintiff was also instructed to also work on the client trust account reconciliation which would also be submitted.

93. Plaintiff felt extreme pressure from these instructions and the fact that she was being held solely and fully responsible for reviewing, recreating, or revising all the attorneys' time entries that each attorney was submitting to document their time on the litigation and their work performed, expenses, and costs. In addition, because she had been charged with ensuring that there were no mismatches of dates and work performed between the time all six (6) attorneys, she felt intense pressure and responsibility. The guesswork and estimation and comparisons required in this task resulted in a lot of back and forth discussions which created significant tensions between the attorneys on the

case. Plaintiff's questioning of the attorneys' time entries also caused tensions between Plaintiff and the attorneys.

94. Further making the task more difficult was the fact that not all of the six (6) attorneys working on the case with Ms. McNulty worked for Defendant. Of the six (6) attorneys working with Ms. McNulty on the case, only three (3) attorneys were employed by Defendant. The remaining three (3) attorneys who worked on the case with Defendant were outside private sector co-counsel. Virtually none of the attorneys had kept contemporaneous time records.

95. The lack of contemporaneously created time records meant that the records provided to Plaintiff essentially for "clean up" for time, work performed, and expenses were noticeably inconsistent. In addition, the attorneys had mixed up their times and expenses on this case with another case they were also working on with outside-counsel.

96. The review of records required to comply with Ms. McNulty's instructions was voluminous. Plaintiff had to go through hundreds of documents to recreate time and expenses on depositions. The review demanded by Ms. McNulty required Plaintiff to review case files in both paper and electronic form, as well as over five thousand emails in Ms. McNulty's in box and over three thousand emails in Plaintiff's inbox pertaining to the fee petition case. To create time entries for Ms. McNulty, Plaintiff had to review over 5,000 emails in Ms. McNulty's email in-box and over 3,000 emails in Plaintiff's possession and on her work computer, and then estimate the time spent on the case. In addition, Plaintiff reviewed over four shelves full of paper records and an array of electronic records, none of which matched. When Plaintiff questioned the ethics

- 25 -

and propriety of the process being used to create the fee petition and the resulting accuracy or lack thereof, Ms. McNulty became hostile towards Plaintiff.

97.    In addition, the tasks assigned to Plaintiff were taking a lot longer than Ms. McNulty had originally estimated, and she became more frustrated when Plaintiff pointed out to her that the attorneys time records were not matching and the time records in the Austin case were being mixed up with other cases, such as the "Pounds" case and another case called the "Peach/Palmer" case.

98.    In November and December 2017 Plaintiff was working voluminous hours of unpaid overtime on the Austin case.  As just one example, on or about December 16, 2017,  the deadline for submitting the documents to the court for approval of the final settlement were due to be filed.  All of the other attorneys at NCJC went home, leaving only Ms. McNulty in the office to meet the next day deadline.  However, Plaintiff stayed with Ms. McNulty at the office all night and then left the office around 8am the following day to go home and get some sleep.  She returned to the office around 2pm later that day and stayed until 9pm at which time, Plaintiff and Ms. McNulty drove to the FedEx drop off box.  When Plaintiff inquired about overtime for the work she did between midnight and 8am, she was told that she would not be paid overtime because midnight started a new day, even though she worked from 2p to 9p on that same day.

99.    After calculating and preparing the final costs and expenses in the Austin case for submission to the court, Plaintiff was exhausted and Ms. McNulty encouraged her to take some time off.  Plaintiff did so and took a trip to Washington DC with her children.

- 26 -

100.   Despite knowing since the settlement in the Fall of 2017 that the fee petition motion and brief and attached attorneys' fees and expenses would need to be attached as supporting documentation, Ms. McNulty waited until the beginning of 2018 in January to get serious about the process of documenting her time.  Defendant was under significant time pressure to produce attorney and staff time records to file with the Court to obtain reimbursement of time and expenses related to the litigation.

101.   Because the attorneys working on the case had not kept contemporaneous records for the time they spent on the case Ms. McNulty and other attorneys put significant pressure on Plaintiff to recreate the needed attorney and staff time records. Plaintiff resisted this directive because of its size and scope, its impending deadline, and what she considered to be her inability to create accurate records for submission to the court, in part due to the sheer volume of records she would have to review and her lack of knowledge about how much time was actually spent on the tasks completed. As Plaintiff resisted the pressure being put on her, the relationship deteriorated between Plaintiff and Ms. McNulty.

102.   Also in January of 2018, Plaintiff was also asked by Ms. McNulty to work on documenting the expenses spent on the litigation because the Defendant's CFO had not kept the expense records organized in a way that made it easy to find the expenses related to the Austin case. Plaintiff began work on the expenses and worked with the finance department to reconcile expenses.  The task of reviewing the Defendant's costs and expenses on the case required not only reviewing all the documents in paper files but also in and electronic files; the files were voluminous given that the expenses in the

- 27 -

case went back nearly seven years. The case had thousands upon thousands of paper documents and electronic documents and much information was also kept only in Ms. McNulty's emails which she had not placed on the NCJC's computer files or printed.

103.  Ms. McNulty had previously scheduled evaluations for all her employees, including the Plaintiff, in mid January 2018. However, the office was closed due to inclement weather on January 17 and 18, and the Plaintiff's evaluation was unable to take place as scheduled.

104.  In mid to late January 2018, a flu epidemic in the community began to spread and Plaintiff was out of work due to the flu from January 24 through January 29. Executive Director Glazier sent emails urging employees with the flu to stay home.

105.  Even though she was out suffering from the flu, Plaintiff continued to work from home on the fee petition. However, Ms. McNulty was constantly in touch with Plaintiff wanting to know when she was coming back to the office and when she was going to finish the fee petition work. Given Ms. McNulty's anxiety and stress, at one point, Plaintiff offered to come to the office even though she had the flu.

106.  Plaintiff returned to the office on Tuesday, January 30, and continued working on the fee petition. Tensions between Ms. McNulty and Plaintiff worsened as the deadline (the end of February) to submit the fee petition approached. Plaintiff kept trying to explain to Ms. McNulty that there was no way, no matter how many overtime hours she spent, that such a task could not be completed by the deadline. All of the recreating 6-7 years of Ms. McNulty's time and reconciling all of the other attorneys' time records was making Plaintiff uncomfortable and anxious because she knew it was

- 28 -

based on guesswork and estimation and she could not vouch for its accuracy.

107. Plaintiff also told Ms. McNulty that she had experience with fee petitions from her time in private practice and that if the work was done sloppily, there could be an objection to the fee petition. In reviewing the attorney time records, Plaintiff noticed there were significant inconsistencies in how much time each attorney had charged for the same or similar task, creating questions about the accuracy of the records and the actual time spent on various matters for which they were billing. Plaintiff informed Ms. McNulty of these inconsistencies.

108. At some point Ms. McNulty told Plaintiff to stop working on her own time and not submit any of Plaintiff's time past October of 2017, so that Plaintiff could focus on only on helping Ms. McNulty recreate her time, and also help reconcile and review all of the time and expenses for the three outside counsel private practice attorneys who had worked on the Austin case with Ms. McNulty. Ms. McNulty also asked Plaintiff to review and submit corrections for one of the Defendant's attorneys, Emily Turner, who had been a recent hire with no prior litigation experience. Notably, all of the edits that Plaintiff submitted for Ms. Turner were approved and retained by Ms. McNulty for final submission to the court.

109. Ms. McNulty and her co-counsel continued to argue about the relative hours being submitted by the attorneys because NCJC was a nonprofit and they were all sole practitioners in small private practices. Ms. McNulty's co-counsel was upset that NCJC was submitting the lion's share of the fees. Ms. McNulty took out her frustration on Plaintiff and would yell and curse at Plaintiff.

- 29 -

110.    During this time leading up to the fee petition filing deadline, McNulty treated Plaintiff with hostility.  Plaintiff believed that the tension and frustration that Ms. McNulty was feeling was being projected onto Plaintiff and hoped that once the fee petition was filed, the tensions would subside and their relationship would return to its former warmth.

111.    After being back at work for more than a week, Plaintiff's entire family came down with the flu and Plaintiff then worked from home for several days in mid-February because her children and husband were sick.  Again, Plaintiff's absence from the office even though she was working on the fee petition seemed to create a great deal of anxiety for Ms. McNulty and additional hostility by Ms. McNulty towards Plaintiff due to the approaching deadline for filing the petition itself.

112.    Plaintiff returned to the office on Thursday, February 15, and worked overtime every day for the rest of that week and the next.  Near the end of February and as the majority of the work was being finalized on the fee petition, Ms. McNulty called an impromptu meeting to conduct Plaintiff's evaluation, which surprised Plaintiff given the impending deadline for submitting the fee petition and the need to spend every available moment working on it.

113.    On February 23, 2018, at the meeting which was supposed to be her evaluation for 2017, Ms. McNulty spent 3.5 hours yelling at Plaintiff about letting her co-counsel in the Austin case see the percentage of fees that the NCJC would be seeking and accusing Plaintiff of having done it on purpose to cause her more problems with her co-counsel.  Plaintiff explained she had followed Ms. McNulty's instructions, worked late

- 30 -

that night to complete the work, and not once did Ms. McNulty tell her to keep the chart confidential. In fact, Plaintiff prepared it based on the numbers submitted by all co-counsel and the NCJC to one another in email correspondence. Thus, there was nothing confidential about the numbers and percentages because they were readily ascertainable based on the information and numbers being shared between email correspondences from NCJC and its three out-side co-counsel.

114. Ms. McNulty's tone during the meeting was elevated, she was yelling the "F" word at Plaintiff and at one point she told Plaintiff she could not stand Plaintiff anymore because Plaintiff made her feel like an incompetent attorney who did not do her job, did not keep records, and did not have rates established for attorneys or paralegals.

115. At one point, HR Lucy Martinez interrupted the meeting between Plaintiff and Ms. McNulty to say she was leaving for the weekend but did nothing to address the situation, despite noticing that Plaintiff was visibly in distress and crying during the meeting.

116. During the meeting, Ms. McNulty told Plaintiff that Ms. McNulty was assigning another attorney to Plaintiff. The attorney to be assigned to her was attorney Emily Turner, who was under a one-year contract as a fellow, but whom Ms. McNulty stated would be hired one way or other permanently or by attrition.

117. Plaintiff took Ms. McNulty's reference to "attrition" to mean that Ms. Turner's position could be funded if Plaintiff was terminated and the funds used to pay Plaintiff's salary could be used to pay Ms. Turner. Ms. Turner's one-year contract was

- 31 -

to expire sometime in September of 2018 and as it turns out, Plaintiff was fired in August of 2018.

118.    In addition, and most upsetting to Plaintiff, during the meeting, Ms. McNulty also informed Plaintiff that she would be expected going forward to have regular work hours from 9am to 5pm, that she would be required to give advance notice if she needed to be out, and that she would not be permitted to come in later than 9am and work eight hours if it took her past 5pm.  She was also told she would not be permitted to make up time during evenings and weekends.  Plaintiff knew that not only was this a new standard for her, it was not being uniformly applied to all of Defendant's employees.

119.    Plaintiff was upset by the meeting and especially by the recission of her flexible work schedule because all of her previous evaluations and work for Defendant had been excellent and because she knew that her fibromyalgia would make it impossible to maintain those specific hours and still get her work done at the same level as she had in the past.  Plaintiff's fibromyalgia was being made worse by all the stress and pressure she was suffering under Ms. McNulty's  hostility.

120.    Plaintiff's negative evaluation and the withdrawal of her flexible work schedule was treatment different from other employees, including employees who were not female, disabled, or who identified as bi-racial. She also knew that she was being treated differently from how she had been treated in the past with regard to her fibromyalgia and Plaintiff believed that her work schedule flexibility and autonomy enjoyed by her up to that date was being withdrawn after Plaintiff resisted recreating

- 32 -

time records for submission to the Court for the attorneys who worked on the Austin case, the accuracy of which Plaintiff could not vouch for.

121.   The meeting between Plaintiff and Ms. McNulty was so loud and heated that apparently it was audible to other staff members. Union steward Ana Pardo actually sent Plaintiff an email during that time offering the union's help to Plaintiff. And another employee, the CFO's assistant, Elise Elliot returned to the office after 7:00 p.m. to interrupt the meeting and stated that it was clear the meeting needed mediation and that it had to stop and offered to take Plaintiff home that night, knowing that Plaintiff needed a ride and was visibly crying and in distress.  Ms. Elliot then offered and did in fact drive Plaintiff home that night.

122.   After the meeting, that evening union representative Pardo sent Plaintiff an email that she had overheard everything and the union wanted to get involved in what they thought was an unacceptable and unprofessional, retaliatory meeting to which Plaintiff had been subjected by Ms. McNulty.

123.   Unfortunately, after Pardo reached out to Plaintiff, Ms. Pardo was given a promotion and salary increase.  After this salary increase, Ms. Pardo was replaced as Union steward under the Collective Bargaining Agreement ("CBA").

124.   Brandon Riley, another union member, then began assisting Plaintiff with her issues with management.  Then, after Riley had numerous conversations with HR Martinez behind closed doors and after he was given funds to travel to conferences and after Mr. Glazier had publicly touted Mr. Riley as a "valuable employee," Mr. Riley also suddenly ceased from assisting Plaintiff.   It became clear to Plaintiff that because the

- 33 -

Union was in the process of negotiating pay raises for staff attorneys and other positions, they were reluctant to assist Plaintiff.

125.    Plaintiff understood that the pay raise negotiations could be jeopardized by friction between the union and management.  In addition, Plaintiff also understood that the Union feared that the rest of the employees might lose their massively flexible working hours if the issue of so-called office hours of 9:00 to 5:00 being used against Plaintiff were then applied to the rest of the employees.

126.    Plaintiff worked 9a – 5p hours on Monday, February 26.  On February 27, Plaintiff took paid time off PTO (and recorded it as such) for her master's program homework, which she had never been required to do before.  Because Plaintiff had received notice only the previous Friday at her "evaluation" of the new attendance requirements for her, Plaintiff scrambled to adjust her personal obligations to meet the newly imposed scheduling constraints by Defendant.

127.    Knowing it was going to be impossible to adjust her and her family's schedule and deal with her medical condition (which again had previously been accommodated for the entirety of her work tenure with Defendant) and wanting to wait until after the fee petition was finally filed, which occurred on Thursday, March 1, 2018, Plaintiff then sent an email to Rick Glazier, ED, Bill Rowe, the Defendant's General Counsel (GC), Lucy Martinez (HR), and copied Ms. McNulty about the hostile work environment she had been subjected to for the past months.  She also hoped that once the situation could be remedied and the hostility resolved that it would be possible to get Defendant to retract the revocation of her flexible schedule which was essential to

her being able to get her work done due to her fibromyalgia. Every other employee at the Justice Center continued to enjoy the same flexible working hours without having to record their work. It was clear that Ms. McNulty only intended to end Plaintiff's flexibility.

128. Specifically, Plaintiff asked for a meeting "concerning the problems and breakdown of [her] working relationship with [her] supervisor, Carlene." Plaintiff further stated "for nearly two months now, I have worked under constant hostility, verbal quarrels, or outright arguments . . . . I now need to know why I am under this hostility and would welcome and deeply appreciate a meeting to try and resolve this incredible amount of stress to me . . . ."

129. Glazier responded on Friday, March 2, 2018, stating that he would schedule a meeting with Plaintiff and Ms. McNulty and had full faith that their superb working relationship could be reestablished between them.

130. On Friday, March 2, Ms. Martinez responded that upon discussing the matter with Mr. Glazier, she had dropped Mr. Rowe, the GC, from the email. Plaintiff responded that she had requested Brendan Riley, the Union Steward, to be present at the meeting with Ms. McNulty and Ms. Martinez, if neither Ms. Glazier or Mr. Rowe were going to be present.

131. On Sunday, March 4, 2018, Plaintiff reached out again to Glazier and expressed her concern about her hostile work environment to which she was expected to return the next day, Monday, March 5. She described her devotion to her position with Defendant, her contributions to Defendant, her guesses about why Ms. McNulty

- 35 -

had suddenly turned on her and decided to treat her badly and with such animosity.

132.    Plaintiff further told Glazier that Ms. McNulty's response to Plaintiff's grievance requesting a meeting to clear the air was that Plaintiff had made "a big mistake." She also reiterated her concerns about the meeting to be scheduled for Monday, March 5, about Ms. Martinez' ability to mediate the situation, and requested that Mr. Glazier please consider being present. Plaintiff also explained that she only requested the Union to be present because of the hostility she had suffered at Ms. McNulty's hands the previous two months and her fear that Ms. McNulty had misconstrued her opinions and edits of the time records and expenses on the fee petition filed on March 1, 2018.

133.    Plaintiff described the work done by herself and Ms. McNulty on the petition and why Plaintiff made the recommendations that she did, based on her experience. Plaintiff again described her work on policies and procedures, including the trust funds and escheats issues, indicated that she did that work above and beyond her regular duties supporting the litigation efforts of Defendant. Plaintiff also informed Glazier that there were still many remaining issues to "clean up" with the trust accounts and escheats even after her work of the past three years.

134.    Plaintiff reiterated her support of the Defendant's work, the trust that had been placed in her, how she had fulfilled that trust, and made sure that in responding to attorneys' questions she had remained discrete and respectfully. She informed Glazier that she had only discussed the deficiencies in all of the time records, the "haphazardness" of the co-counsel's time records which she told Ms. McNulty she could

not be responsible for, and that given the time frame and the due date, they needed to make their own corrections.

135. Plaintiff informed Glazier that only a fraction of her time working on the case had been submitted and at a rate lower than what her time had been valued seven years prior when working in private practice. Finally, Plaintiff expressed her desire to have a "positive meeting and peaceful outcome and to not destroy the near decade of what was once a great working relationship with my supervisor" and she expressed her "immense satisfaction" of being part of Defendant's team.

136. Plaintiff closed by explaining that she was a loyal and hard-working employee and had always worked above and beyond her duties and expectations in part because of her need to prove herself "three times better than the competition because [she] was a minority with chronic pain that sometimes caused [her] to call in due to flare-ups."

137. On March 5, 2018, at 11:54 PM, after Plaintiff had reached out to Rick Glazier, the Executive Director, for assistance in dealing with the withdrawal of her previous accommodations, he stated that he and General Counsel, Bill Rowe, would meet independently with Plaintiff to address both the "legal issues" and "determine the legal calculations and fee petition issues [Plaintiff] raised…[u]pon his return [back to the office the following week]." This email from ED Glazier was similar to a representation that Mr. Glazier made to Plaintiff in earlier email dated March 2, 2018.

138. On or about March 8, Plaintiff inquired of Ms. Martinez (HR) when a meeting would be scheduled to discuss Plaintiff's concerns. Ms. Martinez informed

- 37 -

Plaintiff that she was working with Ms. McNulty to "lay down the ground rules for the meeting" with Plaintiff and that as HR, Plaintiff should understand Ms. Martinez was a member of the Management Team and could not be an impartial party because she was operating in the capacity of the best interest of the Management Team.

139.   Ms. Martinez then sent an email reply on Friday, March 9, a week after Plaintiff had asked for a meeting to address the hostile work environment to which she had been and was being subjected, and apologized for the delay in her response.  Ms. Martinez asked Plaintiff to clarify f she wanted Ms. Martinez to "treat this request for a meeting an intent to file a grievance or as the first step in a grievance."    She then stated that regardless, Ms. Martinez had asked Ms. McNulty to meet at 11:30am on Thursday, March 15 and asked if Plaintiff was available.

140.   On Monday, March 12, Plaintiff explained that she was not available on Thursday because of her long-standing appointment with a specialist in Chapel Hill, which Ms. McNulty was aware of, and Plaintiff was told that if she cancelled, she could not be seen again until May. Plaintiff provided additional days of availability and clarified that it was her intent to file a  grievance.

141.   On Tuesday March 13, Ms. Martinez emailed Plaintiff and informed her that she had two choices:  she could request an "intent to file" meeting which no management representative would attend or she could request a Step One meeting which would be attended by a management representative and a union representative.

142.   Later that day, due to her confusion about the different between the two types of meetings, Plaintiff emailed Ms. Martinez and sought to understand the

- 38 -

difference between the two meetings and what management representative would be allowed to attend a "Step One" grievance meeting.

143. On March 15, 2018, the Plaintiff notified the attorneys whose work she supported that her new schedule was 10:00am to 6:00pm, believing that Ms. McNulty was in agreement with the change as she had previously told Plaintiff that she would agree to allow her to start her day at 11:00am.

144. On March 22, Plaintiff indicated that she did not want to file a grievance against Ms. McNulty personally, that the emails had been confusing, and Plaintiff requested to go back to trying to schedule the meeting she had requested initially on March 1 with Ms. McNulty, Brendan Riley (the then Union representative) and Plaintiff with or without Ms. Martinez.

145. On Friday, March 23, Ms. Martinez sent another email to Plaintiff now giving her three options:

> Option 1: No Grievance: Meeting of Seonaid, Carlene, and Management Rep.
>
> Option 2: Informal Grievance: Meeting of Seonaid, Carlene, and Union Rep.
>
> Option 3: Formal Grievance/Step One: Meeting of Seonaid, Carlene, Union Rep., and Management Rep.

146. On Monday, March 26, 2018, Plaintiff emailed Ms. Martinez and explained that when she asked for assistance on March 1 in the form of a meeting, she was simply making what she thought was a "reasonable request for intervention/mediation and

guidance between my supervisor, Carlene and I." Plaintiff further indicated that her intent "from the outset" was "to seek help to ameliorate the deterioration in my working relationship with Carlene and to restore a good working environment."

147. Plaintiff then stated:

At Carlene's request, I will write to respectfully request reasonable accommodations for a change in my working hours. Carlene and I once had flexibility in my working hours due to my disease and flare-ups, where I could either work later, occasionally work from home, or make up the time within a given week (make up time going to doctor's appointments or make up time missed due to flare-ups}.

I understand from Carlene that I now must ask you and Rick for such accommodations directly. I will gladly obtain any medical information you need. My doctor is out this week, but I have left him a message, asking if he could please fit me in for a few minutes next week or the following to be able to get you any particular documentation I may be able to obtain from him in order to substantiate my request for reasonable accommodations in my schedule. I am being treated by a pain management specialist for neuropathy in my hands and feet, chronic wide-spread pain and fibromyalgia. I also have nearly 10 years of having been treated by a neurologist in Raleigh. Prior to now, Carlene had allowed me the flexibility and I even discussed cutting back my hours and/or working at times from home or one day from which she said would be fine, and that she'd address it with you. But as of Friday, I have been asked to take this matter up with you directly.

Specifically, and most respectfully, I am requesting to cut down my hours weekly with a flexible (or irregular} schedule, as mornings are the hardest time for me to be able to start moving due to my high pain levels and muscular dysfunctions. I am asking to work, full time, 35 hours per week, Mon - Fri from 11:00 a.m. until 6:00 p.m. with 1 hour lunch break. I am also hoping you will allow me to work from home if possible should I need to. If you need me to provide you a limit, would you please consider allowing me to work from home if need be due to pain levels, limited to three (3) days per month, and anything over 3 days would require me to take PTO or UPTO. I would rather make up the time, if I could, but understand whatever limitations you may wish to set.

- 40 -

148. Because Plaintiff had been treated as a salaried employee (despite being classified as a non-exempt employee) and never provided any overtime, Plaintiff had no reason to believe that this request would be unreasonable so long as she continued, as she always had in the past, to get her work done as a paralegal.

149. Finally, Plaintiff reiterated her request for an evaluation for her work in 2017 and requested that the copy of Ms. McNulty's so-called evaluation that had been sent to Plaintiff, which contained references to issues which arose in 2018, not 2017, the year the evaluation was supposed to cover, be revised to eliminate references to the issues which had arisen in 2018.

150. On March 27, 2018, Defendant acknowledged Plaintiff's request and provided her with a release to sign and her job description to take to her health care provider to provide "in writing the nature of your medical condition, the kind of activities, including major bodily functions that your condition affects, and the way in which the activities are affected" and requested that Plaintiff ask her "health care provider to offer suggestions, if any, for the type of accommodation(s) that would assist [her] with being able to perform [her] job functions.

151. In addition, Plaintiff was also required as a part of this formal process to provide a letter from her specialist doctor documenting her fibromyalgia which everyone was aware of for years and which no one had ever questioned.

152. After Plaintiff resisted the newly assigned and required in-office hours, Ms. McNulty intensified her scrutiny of entries in the Paylocity time tracking system. The Paylocity system was never scrutinized for employees to Plaintiff's knowledge and

Plaintiff knew that her supervisor had never reviewed her entries prior to February 23, 2018. The Paylocity system allowed employees to enter their working times.

153.    As Defendant was aware, Plaintiff's fibromyalgia made it impossible for Plaintiff to adhere to the rigid hours assigned to be in the office.  Plaintiff continued to come to work and be in the office as she was able but she often arrived s after her start time.  Ms. McNulty spoke to Plaintiff on these occasions about her arrival time and stressed that she was merely trying to have a definite timeframe during which she could count on the Plaintiff being available to work, which Plaintiff found insincere as she had never required this until February 23, 2018.

154.    After submitting her request for an accommodation as required by Defendant, Plaintiff sought clarification on the accommodation and leave she would be provided.  On May 4, 2018, Ms. McNulty told the Plaintiff that she was willing to approve a schedule of 11:00a.m. to 7:00p.m. and on May 9, 2018, Plaintiff's request was temporarily approved for 30 days pending submission of medical documentation to support a more long-term approval.

155.    Plaintiff attempted to arrive in the office by 11am and stay until 7pm, but the level of physical and emotional stress which Plaintiff felt as a result of the hostile work environment caused by Ms. McNulty, and the imposition of the inflexible in office required hours, exacerbated Plaintiff's condition to such an extent that she was unable to meet the schedule set for by Defendant.  Plaintiff's physician had advised her that if she continued to be required to work in the stressful situation for Ms. McNulty, it was likely that she would experience a worsening of her symptoms.

156. Plaintiff informed HR director Martinez that if Plaintiff continued to have the same supervisor who was continued to be allowed to create a hostile and retaliatory environment, she could not get better. Plaintiff explained that the increase in her health problems and flare-ups were due to the enormous stress and hostility she was facing each day.

157. HR Director Martinez replied that that was not her problem, and that the Defendant expected even their disabled employees to adhere to a schedule. Plaintiff responded to HR Martinez that that was not true and that her accommodation of a flexible work schedule had been taken away from her after 8 years.

158. On May 18, 2019, the Plaintiff submitted documentation from her medical provider which requested a reduced schedule of hours in the office, the ability to work from home, and the ability to make up hours missed during the week either at home or on Saturdays in the office. Plaintiff's physician also recommended that she be given a different supervisor for a period of 12 months, presumably due to the hostile work environment which was exacerbating her condition.

159. In the written letter to Plaintiff dated June 5, 2018, responding to her physician's recommendations, Defendant agreed to reduce her in-office hours with a pay reduction or keep her 40 hours a week in the office at her current pay rate. Defendant also rejected her provider's recommendation and stated that she could work from home no more than one day a week and no more than three day a month. Finally, Defendant also denied the recommendation that she be assigned a different supervisor. Plaintiff's FMLA request for intermittent leave to address the occasions when she was unable to

- 43 -

be at work the assigned hours was not addressed.

160.    The June 5, 2018 letter also stated that her request for an alternate work schedule was approved and would be evaluated at the end of a "90-day trial period" to determine if the "arrangement is meeting the needs of the Justice Center, as well as meeting your needs."

161.    Defendant's decision was discussed with Plaintiff in person on Friday, June 8, and emailed to her that same day, and was scheduled to be implemented effective June 11, 2018.

162.    On that same date, after reading the response, Plaintiff wrote Ms. Martinez, copying Ms. McNulty and Mr. Glazier, an email requesting reconsideration of the decision to continue Ms. McNulty's supervision of Plaintiff.  Plaintiff had begun to suspect that Defendant's unwillingness to return to Plaintiff the previous flexible work schedule she had prior to February 23, 2018, was designed to set her up for termination.

163.    Ms. Martinez responded on Monday June 11th indicating that under the ADA a change in supervisor is not a reasonable accommodation.  She also indicated that Plaintiff's physician's letter did not "substantiate [her] medical need for a change in supervisor."  Finally, Ms. Martinez told Plaintiff that a change in supervisor was not reasonable for Defendant because they had "no managerial staff person better or equally suited to supervise" Plaintiff's work.  She nonetheless offered to meet with Plaintiff to discuss further.

164.    Plaintiff responded to Ms. Martinez and reiterated the stress that she was undergoing as  result of working for Ms. McNulty due to the hostile work environment

- 44 -

to which she was subjecting Plaintiff. Plaintiff also questioned whether other paralegals were being held to strict in and out times like Plaintiff. Finally, Plaintiff also asked what additional information was needed for the Defendant to understand the "severity of [her] illness at times during flare-ups and transitioning in the morning with stiff joints and widespread pain." Plaintiff stated that she thought it would be well understood as she had shared this information with Ms. Martinez, Ms. NcNulty, and Mr. Glazier for years. Plaintiff also expressed her surprise that Mr. Glazier would need more information as she knew that he also suffered from fibromyalgia and had neurological pain.

165. During the first week of the 90 day trial period and part of the interactive process, Plaintiff's supervisor sent emails which continued and accelerated the hostile work environment resulting from Plaintiff's opposition to the withdrawal of the reasonable accommodation of a flexible work schedule that Plaintiff had enjoyed for almost eight years prior to February 23, 2018, and Plaintiff's refusal to go along with the retaliatory treatment of her for asserting her rights to that continued accommodation.

166. On Tuesday, June 19, 2018, one week after the implementation of her accommodation on June 11, 2018, which was supposed to in effect for 90 days to determine if the "arrangement is meeting the needs of the Justice Center, as well as meeting your needs," Ms. McNulty scheduled a formal counselling session with the Plaintiff regarding her continued failure to adhere to her work schedule, which at the time was 10:30a.m. to 6:30 pm.

- 45 -

167.   Mr. Rowe, Defendant's General Counsel, was present for the counselling presumably in an attempt to convince Plaintiff that how she was being treated was consistent with the law. Ms. McNulty reminded the Plaintiff of the approved accommodations - a daily schedule of 10:30a.m. to 6:30p.m. and the ability to work from home one day per week, up to three days per month - and explained that the Plaintiff was expected to adhere to those requirements.

168.   No mention was made of the availability of FMLA leave to address the hours she could not be at work due to her fibromyalgia.  This meeting confirmed Plaintiff's suspicions that she was being targeted for termination and that Defendant had no intention of engaging in the interactive process in good faith.

169.   This counselling session documentation created by Ms. McNulty to document Plaintiff's lack of adherence to the schedule implemented June 11, 2018, actually described incidents which went back as far as May 4, 2018, with no mention of the ADA interactive process and no mention of the availability of FMLA.

170.   Moreover, this "counselling session" occurred despite the fact that Plaintiff had been informed that the arrangement in place as a result of the accommodation request would be continued for 90 days to give both parties time to evaluate whether the arrangement was meeting their needs.

171.   Thus, less than two weeks, only 6 workdays, into the 90-day period, on June 19, 2018, while the interactive process was still ongoing, Defendant took adverse against  Plaintiff in the form of a "formal counselling session."  While the alleged "transgressions" of that one week and one day involved being on time two days and being

- 46 -

"late" on three others, Defendant could not show that Plaintiff failed to work her required number of hours per week, but only that she did not work them strictly between 10:30am and 6:30pm, which she had never been required to do prior to February 23, 2018.

172.    On June 26, 2018, five working days later, Ms. McNulty issued Plaintiff a written warning and 60-day performance improvement plan ("PIP"). The PIP detailed the frequency with which the Plaintiff had failed to arrive at work on time between June 11 and June 26, the hardship being created by her unpredictable schedule, and the Justice Center's expectations for immediate improvement. Again, this adverse action occurred during the 90-day interactive process established by Defendants and like the formal counseling document, referred to events which took place in April and May 2018, prior to the "accommodation" provide effective June 11, 2018, when Defendant agreed only that Plaintiff could work at home on certain days, but rejected her request for a different supervisor and flexibility in her arrival time. In addition, it made no reference to the Defendant's agreement to give the June 2018 arrangement 90 days to be evaluated as part of the interactive process.   And again, it made no mention of the availability of FMLA to cover Plaintiff's intermittent absences from work, which she would not need if she had a flexible arrival time and could work past 6:30pm. Finally, it did not allege state that Plaintiff failed to work her requisite number of hours, only that she did not arrive and leave work at the appointed hours.

173.    Plaintiff was told her productivity had gotten lower, which Plaintiff explained was because she was no longer working extra hours for free which she had

since she started in 2010, and because she had started taking her lunch breaks sometime in May of 2018 to get out from under the hostile work environment. The reduction in the hours that Plaintiff had previously worked for free seemed to infuriate Ms. McNulty.

174.    The PIP was allegedly based on Plaintiff's inability to perform the duties of her position after her former reasonable accommodation of a flexible schedule was withdrawn.  The withdrawal of the accommodations combined with the mental and emotional stress suffered by Plaintiff when she was required to attending meetings with HR and Ms. McNulty during which she was intimidated and often yelled at, continued to cause a deterioration in Plaintiff's health.

175.    Plaintiff requested a copy of her personnel file which Ms. Martinez provided Plaintiff on June 27, 2018. When Plaintiff reviewed the file provided by Ms. Martinez, there were no previous evaluations in her file.

176.    When Plaintiff asked HR Martinez where the evaluations were, she told Plaintiff that HR had simply not asked for any evaluations from Plaintiff's supervisor since 2010. Ms. Martinez did offer that she had a copy of the evaluation finalized by Ms. McNulty on April 18, 2018.  When Plaintiff asked Ms. McNulty where her evaluations were, Ms. McNulty stated that she "forgot" to turn the evaluations in to HR for seven consecutive years.

177.    The Plaintiff had requested vacation time and was approved by HR and Ms. McNulty sometime in April of 2018.  Plaintiff went on vacation on Wednesday, June 27, 2018, the day after she was issued the written warning and PIP and returned on

- 48 -

Monday, July 16, 2018. As of July 16, 2018, Plaintiff was into 20 days into her 60 day improvement period established by the PIP, but had not been at work for any of those 20 days. Plaintiff was also 36 days into her 90 day interactive process evaluation period of her accommodations, but also not having worked 20 of those days.

178. After her return from vacation, Ms. McNulty's hostility was unrelenting. In fact, during her vacation Ms. McNulty frequently called Plaintiff and made her submit explanations for her hours worked weeks before taken her vacation. This was the first vacation Plaintiff had requested and taken in the eight years she had worked at the JC. Ms. McNulty thus continued her hostility against Plaintiff even while Plaintiff was out of the office on her long-standing pre-approved vacation since April of 2018.

179. At one point, signaling to Plaintiff how beyond reproach Ms. McNulty felt, she asked Plaintiff point-blank in an accusatory tone whether she was pregnant again, indicating that she looked pregnant and not just suffering from inflammation due to fibromyalgia flare-ups or medication side-effects which she was aware affected Plaintiff's appearance. Plaintiff was shocked at her brazenness.

180. During the week after Plaintiff returned from vacation on Monday, July 16, Plaintiff adhered to the schedule set by Ms. McNulty every day, with the exception of Wednesday, July 18, when she was 25 minutes late.

181. On Thursday, July 19, 2018, Plaintiff submitted a formal request for intermittent leave under the FMLA with the documentation from her doctor, which she had never been required to do before, because she had always been permitted to shift

- 49 -

her schedule and work her hours as necessary to get her work done; she had never been required to be in the office certain hours and required to take leave when she was not. Plaintiff had been unable to find any NCJC policy regarding FMLA and the Paylocity system used by Defendant did not have an FMLA drop down option.

182.    The next week beginning Monday July 23, through July 27, 2018, Plaintiff adhered to the schedule set by Ms. McNulty, with the exception of Tuesday, July 24, 2018, on which day Plaintiff was sick and took PTO.

183.    On Thursday, July 26, 2018, Plaintiff was approved to take intermittent leave under the FMLA.

184.    Between June 26, 2018, the date of the written warning and PIP issued to Plaintiff, and July 26, 2018, when Plaintiff was approved to take intermittent FMLA leave, Plaintiff was late only once, by 25 minutes on July 18, 2018, because she forgot her wallet and had to go back home.

185.    Between July 30 and August 1, Plaintiff was requested to get clarification from her physician regarding whether she needed up to 1-2 days of leave or up to 1-3 days of leave.  On August 2, Plaintiff submitted a clarification from her physician.

**PLAINTIFF'S ALLEGED MISCONDUCT (AUGUST 3-7)**

186.    On Friday, August 3, 2018, Ms. McNulty assigned the Plaintiff to do some research at the courthouse.

187.    At 1:10pm, Plaintiff texted Ms. McNulty and asked if she should take lunch from 3-4pm. Ms. McNulty told her that would be fine. At 3:38pm the Plaintiff texted Ms. McNulty and stated that she was starting her lunch hour. She told Ms. McNulty that

the courthouse system had crashed and then the manager at the courthouse needed her assistance so that had delayed her lunch break.

188. Plaintiff arrived to the Justice Center at approximately 4:30pm. Upon her arrival, Ms. McNulty asked Plaintiff what she knew about files concerning the fee petition files being moved in the Austin case.

189. Plaintiff had no knowledge of any files being copied and informed Ms. McNulty of the same. It was not clear to Plaintiff why Ms. McNulty was asking Plaintiff about the files as Plaintiff could have copied the files at any time between when they were filed on March 1, and that day, Friday, August 3, 2018.

190. On Monday, August 6, Plaintiff was again assigned to do research at the courthouse. At 2:51pm, Ms. McNulty sent an email to Plaintiff stating:

> Seonaid—
>
> As I told you before you left for the courthouse today, I have scheduled a meeting to take place tomorrow, August 7, 2018, at 2:00 PM, to engage in formal counseling relating to your work performance. We engaged in informal counseling on June 1st to discuss an issue involving your exercise of poor judgment and/or substituting your judgment for my own. That issue has continued, and is affecting the quality and content of the work getting done at the Justice Center.
>
> Also, we will discuss your performance so far under the Personal Improvement Plan.
>
> You have a right to have a Union representative present. At your request, I am copying Mel on this email.
>
> Thanks,
> Carlene

191. After receiving the email from Ms. McNulty on the afternoon of Monday,

August 6, Plaintiff replied to Ms. McNulty at 5:19pm that same day, asking for more

detail regarding the discussion to be had on Tuesday, August 7:

> Carlene, I have no idea what informal counsel you are referring to back on June 1st. I had two disciplinary memos from your dated June 19 and June 26th, wherein neither of them contained this statement you make or informal counseling. What are you referring to exactly? I should know so that I can be prepared to respond tomorrow. Why are you bringing up something from June 1st not addressed in either step two of the PIP Step three? I have no idea what you are referring to. On Friday you said you wanted to have a meeting to address "my 17 questions daily to you" when asking for clarification on the PIP to ensure I comply.
>
> I was the one that brought to your attention today that the 30 days we were supposed to meet per PIP was last Friday July 26th and you had forgotten, and said you'd add it to tomorrow's meeting. I have no idea what you are referring to in this email to me. Other than saying you were mad I asked too many questions seeking clarification on PIP to ensure compliance.
>
> How can I prepare to respond tomorrow in all fairness if you will not specifically state what it is you are accusing me of that "is affecting the quality and content of the work getting done at the justice center." Or what are you referring to as my "substituting" my judgment for your own? Can you please let me know so I can be prepared. I again feel blindsided by you and your continued aggressions and hostilities toward me. It seems only fair you specifically tell which particular events you are referring to so that I may no longer be blindsided by you accusations and can have time to be prepared.
>
> Respectfully, please be fair, and specify so that I may prepare for tomorrow's meeting and the meeting can be fair and transparent.

192.   Ms. McNulty replied to Plaintiff at 5:37pm, stating:

The informal counseling, I am referring to has to do with you sending an email to opposing counsel in one of our cases without discussing it with me before you did so.

Yes, you brought it to my attention that we were supposed to meet to review the PIP when 30 days was up, and 30 days had already passed. That is why we are adding it to the meeting tomorrow—you reminded me we needed to do that.

As a courtesy, I am giving you 24 hours-notice of this meeting so you can more easily secure Union representation. I will go over my concerns with you at the meeting, and you will have an opportunity to respond to them.

193.     On Tuesday, August 7, at the appointed hour of the meeting, Ms. McNulty and Ms. Martinez met with the Plaintiff.  Ms. McNulty and Ms. Martinez however  did not ask her about the topic Ms. McNulty had told her was the subject of the meeting, described as 1) "an issue involving your exercise of poor judgment and/or substituting your judgment for my own," and 2) an issue involving Plaintiff "sending an email to opposing counsel in one of our cases without discussing it with me before you did so."

194.     Instead, Ms. Martinez and Ms. McNulty quizzed Plaintiff about the time she had reported having worked on Friday, August 3, and the time she recorded. Although taken by surprise, Plaintiff stated that she believed she arrived at the courthouse at approximately 11:20am - 50 minutes after her scheduled start time. She stated that the courthouse system had crashed causing a delay, and that she had to assist courthouse personnel which further delayed her start time. Plaintiff knew that she had returned to the NCJC at approximately 4pm and that she had worked the amount of time she recorded for that day.

195.     After the discussion of her time for Friday, August 3, Ms. McNulty also reviewed the Plaintiff's attendance and told Plaintiff that she had engaged in ongoing violations of the attendance guidelines set forth in the June 26 written warning and PIP.  In fact, Plaintiff knew that she had been late **once** between the written warning and PIP on June 26, 2018, and July 26, when she had been granted intermittent FMLA.

- 53 -

196. Ms. McNulty acknowledged that Plaintiff had done her best to adhere to her PIP and acknowledged that her adherence to the start times for work had improved. Plaintiff recorded the meeting because she was afraid of Ms. McNulty and Ms. Martinez and did not trust them.

197. Unbeknownst to Plaintiff, while the meeting with the Plaintiff was being conducted on August 7 between Ms. McNulty and Ms. Martinez, Mr. Glazier received a letter from an attorney whom Plaintiff had retained. The letter contained allegations that Plaintiff had been discriminated against because of her race, sex, and disability, and retaliated against for bringing her concerns about possibly unethical activity to management's attention by revoking the flexible work schedule she had enjoyed as a reasonable accommodation for her fibromyalgia since 2010.

198. On the morning of August 8, 2018, Plaintiff was placed on paid administrative leave by Ms. Martinez. Ms. Martinez asked the Plaintiff to come in for a meeting with her and Mr. Glazier at 2:00pm that afternoon and at that meeting, Mr. Glazier told Plaintiff she was terminated and gave Plaintiff a termination letter.

199. The termination letter was vague as to the specific acts committed by Plaintiff that justified her termination but citied her violation of her performance improvement plan on "multiple occasions." Plaintiff was aware however that between the institution of the PIP on July 26, and Plaintiff's approval for FMLA on July 26, 2018, she was late on **one** occasion by 25 minutes. As for any absences from work between July 20 and August 8, having been approved to take FMLA intermittent leave on July 27, effective back to July 20, Plaintiff was entitled to use FMLA intermittent leave and

was thus terminated for doing so if the reasons for her termination was her absence from the workplace due to her fibromylgia.

## COUNT ONE
## DISCRIMINATION IN VIOLATION OF THE ADA

200. Plaintiff incorporates the allegations contained in ¶¶ 1 – 198 as though fully set forth herein.

201. Plaintiff was a qualified disabled employee.

202. Plaintiff was provided a reasonable accommodation between her hire and February 23, 2018, in the form of a flexible work schedule, which allowed her to perform her essential job functions at a superior level.

203. Defendant withdrew Plaintiff's accommodation for an illegitimate reason or reasons.

204. The reason given for withdrawing Plaintiff's accommodation was pretextual.

205. Because Defendant withdrew its previously provided reasonable accommodation, Plaintiff was unable perform the essential functions of her job at the same level at which she had previously performed them.

206. Defendants then subjected Plaintiff to a hostile work environment, called Plaintiff's failure to work between certain work hours insubordination and gross misconduct, and subsequently terminated her.

207. This termination violated Plaintiff's rights to a reasonable accommodation under the ADA.

208. The termination also violated Plaintiff's rights to be free from discrimination under the ADA.

- 56 -

## COUNT TWO
## RETALIATION IN VIOLATION OF THE ADA

209.    Plaintiff incorporates the allegations contained in ¶¶ 1 - 207 as though fully set forth herein.

210.    Plaintiff was provided a reasonable accommodation between her hire and February 23, 2018, in the form of a flexible work schedule, which allowed her to perform her essential job functions at a superior level.

211.    Defendant withdrew Plaintiff's accommodation for an illegitimate reason or reasons.

212.    Plaintiff protested Defendant's withdrawal of her reasonable accommodation.

213.    Defendants then subjected Plaintiff to a hostile work environment, called Plaintiff's failure to work specific work hours insubordination and gross misconduct, and subsequently terminated her.

214.    Defendants terminated Plaintiff for protesting the withdrawal of her reasonable accommodation which was a violation of Plaintiff's rights to be free from retaliation under the ADA.

## COUNT THREE
## SEX AND RACE DISCRIMINATION IN VIOLATION OF TITLE VII

215.    Plaintiff incorporates the allegations contained in ¶¶ 1 - 213 as though fully set forth herein.

216.    Plaintiff was a qualified female, bi-racial disabled employee.

217.    Plaintiff was provided a reasonable accommodation between her hire and

- 57 -

February 23, 2018, in the form of a flexible work schedule which allowed her to perform her essential job functions at a superior level.

218.   Defendant withdrew Plaintiff's flexible work schedule for an illegitimate reason or reasons.

219.   The reasons given for withdrawing Plaintiff's flexible work schedule were pretextual.

220.   Other male employees and other employees who were not bi-racial were allowed to have a flexible work schedule.

221.   Defendants then called Plaintiff's failure to work specifically between certain hours insubordination and gross misconduct and terminated her.

222.   Plaintiff was treated differently from other male employees and other employees who were not bi-racial  in violation of her right to be free from sex and race discrimination under Title VII.

**COUNT FOUR**
**RETALIATION IN VIOLATION OF TITLE VII**
**FOR OPPOSING SEX AND RACE DISCRIMINATION**

223.   Plaintiff incorporates the allegations contained in ¶¶ 1 - 221 as though fully set forth herein.

224.   Plaintiff was a qualified female, bi-racial disabled employee.

225.   Plaintiff was provided a reasonable accommodation between her hire and February 23, 2018, in the form of a flexible work schedule which allowed her to perform her essential job functions at a superior level.

226.   Defendant withdrew Plaintiff's accommodation for an illegitimate reason

- 58 -

or reasons.

227. The reasons given for withdrawing Plaintiff's accommodation was pretextual.

228. Other male employees and other employees who were not bi-racial were allowed to have a flexible work schedule.

229. Plaintiff protested Defendant's withdrawal of her flexible work schedule and the fact that she was being treated differently than other similarly situated employees.

230. Defendants then called Plaintiff's failure work specific hours insubordination and gross misconduct and terminated her.

231. Plaintiff's termination was in retaliation for protesting Defendant's discrimination against her based on her race and sex and was in violation of her right to be free from retaliation under Title VII.

## COUNT FIVE
## WILLFUL WAGE AND HOUR VIOLATIONS OF THE FLSA

232. Plaintiff incorporates the allegations contained in ¶¶ 1 - 230 as though fully set forth herein.

233. The overtime provisions set forth in the FLSA, 29 U.S.C. §§ 201, et seq., and the supporting federal regulations, apply to Defendant and protect Plaintiff.

234. Defendant has willfully failed to pay Plaintiff overtime for hours that she worked in excess of 40 hours in a workweek.

235. As a result of Defendant's willful and unlawful acts, Plaintiff has been

- 59 -

deprived of overtime compensation and other wages in amounts to be determined at trial, and is entitled to recovery of such amounts, liquidated damages, attorneys' fees, costs, and other compensation pursuant to the FLSA.

## COUNT SIX
## WILLFUL VIOLATIONS OF THE FLMA IN THE FORM
## OF INTERFERENCE

236.    Plaintiff incorporates the allegations contained in ¶¶ 1 - 234 as though fully set forth herein.

237.    Defendant is an employer covered by the FMLA pursuant to 29 U.S.C. § 2601 et seq. because it is a private business that employed fifty or more employees for each working day for at least twenty workweeks in the year prior to Plaintiff's request for leave.

238.    Plaintiff is an FMLA-eligible employee because she was employed by Defendant for almost eight years prior to requesting FMLA leave and had been employed by Defendant for over 1,250 hours in the twelve-month period prior to her request.

239.    Plaintiff was entitled to FMLA leave because she has a serious medical condition, namely fibromyalgia.

240.    At no time prior to Plaintiff's formal request for leave under the FMLA on July 20, 2018, did Defendant's provide Plaintiff with any information about her eligibility to take leave under the FMLA.

241.    On her own, Plaintiff inquired about FMLA and submitted the necessary

paper work on July 20, 2018. Immediately thereafter, Defendants questioned the nature of the leave they had already approved and required Plaintiff to seek additional clarification from her physician.

242. Defendant engaged in prohibited conduct under the FMLA by interfering with, restraining, and denying Plaintiff her rights provided under the Act from February 23, 2018, to July 20, 2018.

243. Defendants denied Plaintiff leave to which she was entitled under the FMLA in that it refused to allow Plaintiff to use the full amount of requested FMLA leave and by terminating her for her absences from work which should have been covered by FMLA leave.

244. Defendant discouraged from fully using FMLA leave by questioning her about her physician's notes and by issuing her disciplinary actions and performance improvement plans for absences from work which should have been covered by FMLA.

245. Defendant's action in terminating Plaintiff for exercising her rights to be absent from work due to a serious medical condition action foreclosed Plaintiff's rights under the FMLA, including but not limited to the right to be e free from threats and harassment for exercising her rights under the law.

246. As a direct and proximate result of Defendant's willful and wrongful acts and omissions, Plaintiff has suffered and continues to suffer substantial losses, including expenses related to additional medical treatment and past and future lost wages and benefits. Plaintiff is also entitled to liquidated damages and attorneys' fees and costs, and other damages as recoverable by law.

- 61 -

## COUNT SEVEN
## WILLFUL VIOLATIONS OF THE FLMA IN THE FORM
## OF RETALIATION

247.   Plaintiff incorporates the allegations contained in ¶¶ 1 - 245 as though fully set forth herein.

248.   Plaintiff exercised her FMLA rights by taking leave that should have been designated as protected under the FMLA from February 23, 2018, to August 8, 2018.

249.   Plaintiff was qualified for her position and had performed her job duties effectively prior to the acts complained of herein.

250.   Plaintiff suffered an adverse employment action in that she was subjected to disciplinary action and eventually termination.

251.   Defendant's termination of Plaintiff occurred 19 days after she requested, and 13 days after Defendant approved, FMLA leave.

252.   Defendant's alleged reason for terminating Plaintiff's employment, "multiple violations of her performance improvement plan" and "gross misconduct" are pretextual and baseless. Alternative, Defendant's reasons for terminating Plaintiff's employment, "multiple violations of her performance improvement plan" and "gross misconduct" were her taking leave due to her serious health condition.

253.   Either way, Defendant's conduct constitutes unlawful retaliation against Plaintiff in violation of Plaintiff's rights under the FMLA.

254.   As a direct and proximate result of Defendant's willful wrongful acts and omissions, Plaintiff has suffered and continues to suffer substantial losses, including

- 62 -

expenses related to additional medical treatment and past and future lost wages and benefits. Plaintiff is also entitled to liquidated damages and attorneys' fees and costs, and other damages as recoverable by law.

## COUNT EIGHT
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY UNDER STATE LAW

255.    Plaintiff incorporates the allegations contained in ¶¶ 1 - 253 as though fully set forth herein.

256.    Plaintiff was discharged in violation of the public policy of the State of North Carolina reflected in Chapter 168A of the North Carolina General Statutes entitled the "North Carolina Person with Disabilities Protection Act" in which the General Assembly declared that "the practice of discrimination based upon a disabling condition is contrary to the public interest and to the principles of freedom and equality of opportunity; the practice of discrimination on the basis of a disabling condition threatens the rights and proper privileges of the inhabitants of this State; and such discrimination results in a failure to realize the productive capacity of individuals to their fullest extent."

257.    Plaintiff was also discharged in violation of the public policy of the State of North Carolina reflected in Article 4 of Chapter 84 of the North Carolina General Statutes wherein the General Assembly created the North Carolina State Bar and empowered it to regulate the professional conduct of licensed lawyers thereby evidencing an intent that lawyers conduct themselves in accord with its rules of professional conduct, including those governing the collection of fees.

- 63 -

258.   Plaintiff was also discharged in violation of the public policy of North Carolina reflected in Article 2 and Article 21 of Chapter 95 of the of the North Carolina General Statutes wherein the General Assembly expressed the public policy inherent in paying employees overtime to which they are entitled and that the public policy interest in preventing retaliatory action against employees making good faith complaints about wage and hour violations.

259.   As a result of her wrongful discharge by defendant in violation of the public policy of this State, Plaintiff suffered the harms and damages alleged above in this complaint.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully prays that this Court:

1.    That this Court issue an injunction directing the Defendant to re-employ Plaintiff;

2.    That this Court enjoin the Defendant from discriminating against Plaintiff on the basis of her disability, race, and sex in the terms and conditions of employment;

3.    That this Court enjoin the Defendant from retaliating against employees who protest illegal discrimination in the terms and conditions of employment;

4.    That this Court enjoin Defendant from engaging in future violations of the Fair Labor Standards Act and Family and Medical Leave Act;

5.    That this Court order Defendant to make whole Plaintiff by providing her with appropriate lost earnings and other lost benefits, with prejudgment interest, in

- 64 -

amounts to be proved at trial, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices, including, but not limited to, reinstatement;

6.     That this Court order Defendant to make whole Plaintiff by providing her compensation for pecuniary losses resulting from Defendant's unlawful employment practices, including, but not limited to, costs incurred for health and life insurance premiums, retirement, and other lost benefits, in amounts to be determined at trial;

7.     That this Court order Defendant to make whole Plaintiff by providing her with compensation for nonpecuniary losses resulting from Defendant's unlawful employment practices, including emotional pain, suffering, inconvenience, and mental anguish in amounts to be proven at trial;

8.     That this Court order Defendant to institute and carry out policies, practices, and programs which provide equal opportunities to qualified individuals with disabilities, and which eradicate the effects of past and present unlawful practices;

9.     That this Court award the Plaintiff reasonable attorney's fees and the other costs of this action;

10.     That this Court award Plaintiff such other and further relief as may be just and equitable.

## JURY TRIAL DEMANDED

Plaintiff request a jury trial on all questions of fact raised by the Complaint.

Respectfully submitted, this the 10th day of May 2021.

/S/ VALERIE BATEMAN
 NC State Bar: 13417
 T/F 919-436-3592
 FORREST FIRM, P.C.
 406 Blackwell St., Suite 420
 Durham, NC 27701
 valerie.bateman@forrestfirm.com

/S/ RACHEL M. BLUNK
 NC State Bar: 42694
 T/F 336-663-1052
 FORREST FIRM, P.C.
 125 S Elm St., Suite 100
 Greensboro, NC 27401
 rachel.blunk@forrestfirm.com

*Attorneys for Plaintiff*

# VERIFICATION OF SEONAID RIJO

SEONAID RIJO, being duly sworn, deposes and says:

That the contents of the foregoing Complaint about which she has knowledge are true to her own knowledge, except as to matters stated on information and belief, and as to those matters, s/he believes them to be true.

_SEONAID RIJO_

SEONAID RIJO

Subscribed and sworn to before me this day

By SEONAID RIJO

on the 10th day of May 2021.

_Jennifer L. Reynolds_

NOTARY PUBLIC

My Commission Expires:

12/7/2021